1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

8  ANTHONY JAMES MYERS,

9              Petitioner,

10        v.

11  BRYAN D. PHILLIPS, et al.,

12              Respondents.

13

Case No. 1:23-cv-00409-JLT-SAB-HC

FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS

ORDER DENYING PETITIONER'S REQUEST FOR ORAL ARGUMENT

(ECF No. 29)

14      Petitioner, represented by counsel, is a state prisoner proceeding with a petition for writ

15  of habeas corpus pursuant to 28 U.S.C. § 2254.

16                                          **I.**

17                                  **BACKGROUND**

18      On August 16, 2018, Petitioner was found guilty by a jury in the Tulare County Superior

19  Court of multiple sex crimes against three minor victims. (3 CT[1] 593–631; ECF No. 1 at 10–

20  11.[2]) On October 12, 2018, Petitioner was sentenced to an imprisonment term of 225 years to life

21  plus 13 years. (3 CT 698–700, 705–06; ECF No. 1 at 11.) On December 21, 2021, the California

22  Court of Appeal, Fifth Appellate District, stayed the sentence imposed on count 10 and affirmed

23  the judgment in all other respects. People v. Myers, No. F078318, 2021 WL 6050630, at *14

24  (Cal. Ct. App. Dec. 21, 2021). On March 16, 2022, the California Supreme Court denied

25  Petitioner's petition for review. (LDs[3] 25, 26.) Petitioner did not file any state post-conviction

26  collateral challenges. (ECF No. 1 at 13.)

27  _____
[1] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent. (ECF No. 24.)
[2] Page numbers refer to the ECF pagination stamped at the top of the page.

28  [3] "LD" refers to the documents lodged by Respondent. (ECF No. 24.)

On March 19, 2023, Petitioner, through counsel, filed a federal petition for writ of habeas corpus in this Court. (ECF No. 1.) The petition raised the following claims for relief: (1) violation of Petitioner's right to confrontation; (2) violation of Petitioner's right to a fair trial; and (3) cumulative error. (ECF No. 1.) On May 12, 2023, Respondent filed a motion to dismiss the petition because the cumulative error claim was unexhausted. (ECF No. 13.) On October 31, 2023, the Court granted Respondent's motion to dismiss in part and dismissed the cumulative error claim without prejudice. (ECF No. 21.) On December 26, 2023, Respondent filed an answer. (ECF No. 23.) Petitioner filed a reply and requested oral argument. (ECF Nos. 28, 29.)

## II.

## STATEMENT OF FACTS[4]

### I. Prosecution's case-in-chief

#### a. *Testimony of Ashley*

Ashley married defendant in August 2004. In 2008, she discovered child pornography on their computer. Ashley confronted defendant, who claimed that "someone had hacked into [the] computer and put some spyware, malware and all kinds of stuff on it ...." She "didn't know any better" and believed him. In 2009, Ashley gave birth to their daughter S.M. In 2016, the couple separated and shared child custody.

In June 2017, Ashley discovered adult pornography on S.M.'s tablet computer. She spoke to her daughter about "good touch, bad touch" and asked, "Has anyone ever touched you inappropriately?" S.M. replied that "her daddy did," gesturing that defendant had rubbed her vagina "to help her sleep." She also made a motion with her hand "moving back and forth towards the mouth" and indicated that he "tried to make her do this." When Ashley asked S.M. how she came across the pornographic material, S.M. replied that she "watch[ed] daddy watch that on TV."

At trial, Ashley denied telling S.M. or any else to falsely accuse defendant of sexual misdeeds.

#### b. *S.M.*

##### i. <u>June 21, 2017 CART[5] interview</u>

S.M., then seven years old, told the forensic interviewer that defendant "d[id] gross stuff to [her]." Once, he forced her to "suck" his "pee pee," i.e., penis. He attempted this "lots of times." Defendant also touched S.M.'s "pee pee," i.e., vagina, at least four times. He told her that " '[i]t feels good' " but "to keep it secret."

---

[4] The Court relies on the California Court of Appeal's December 21, 2021 opinion for this summary of the facts of the crime. <u>See</u> <u>Vasquez v. Kirkland</u>, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).
[5] Child Abuse Response Team.

### ii. Trial testimony

S.M., then eight years old, testified via closed-circuit television. She "d[id]n't like" talking about defendant and "d[id]n't know" how she felt toward him. Something unpleasant had happened in his bedroom that S.M. did not want to partake in, but she could not recall the details because her memory was "[s]crambled." She confirmed that defendant touched her body but could not elaborate because "[t]hat part is hard to explain." When S.M. first disclosed the incident to Ashley, she told her the truth.

S.M. was both "[r]eally mad" and "sad" to testify. She was also scared that "[defendant]'s going to say mean stuff to [her]." Before S.M. testified, she had spoken with Ashley, who had told her to tell the truth on the witness stand.

### c. Testimony of M.W.

M.W. was 15 years old when she visited her cousin Ashley and defendant for about a one-week period in the summer of 2014. One night, she experienced anxiety and went outside to calm herself down. Defendant joined M.W. and the two went for a walk. During the stroll, he "pushed [her] up against [a] fence," "pinned down" her arms, and asked "if he could kiss [her]." Although M.W. "told him no," defendant kissed her on the lips. He also groped her breasts. On the way back home, defendant asked M.W. if she "wanted to let him eat [her] out" and other "disgusting things."

Two more incidents occurred in M.W.'s bedroom. The first time, while she was sleeping, defendant "spoon[ed]" her, i.e., "[her] back was up against his front and he had his leg over [her hip]." He placed his hand underneath her shirt and groped her chest and then placed his hand underneath her pants and touched her vagina. When defendant tried to put his hand underneath M.W.'s underwear, he complained that she "didn't shave" her pubic hair and called her "disgusting." The second time, M.W. "woke up to [defendant] jacking off in [her] face." He "asked [her] to suck his cock" and "jack him off with [her] hands," but she refused. Before leaving, defendant ejaculated on M.W.'s knee and said, "Thank you."

The last incident took place in the kitchen. While M.W. was "making something to eat," defendant "lifted [her] up," "pushed [her] up against the counter," and "grabbed [her] vagina." She felt his erection pressed against her inner thigh. Defendant placed his hand underneath M.W.'s shirt and bra and fondled her breasts. He also kissed her neck and face. M.W. "told [defendant] to stop" and "leave [her] alone" and tried to push him off, but to no avail. Thereafter, he asked her "if [she] liked it," "if [she] wanted to do it again," and "if he could eat [her] out."

### d. Testimony of A.P.

A.P., Ashley's sister, was five years old when she first met defendant in 2004. She encountered him on a consistent basis between the ages of five and 17. During that period, defendant sexually abused A.P. "about 20 times." Each episode adhered to a "basic routine": he would kiss her mouth and try to put his tongue inside, rub her vagina, force his penis into her mouth, and then "say some weird shit like, 'good job.'" Sometimes, defendant kissed A.P.'s stomach and tried to kiss her vagina. Occasionally, he would attempt to insert his fingers

and/or his penis into her vagina without success. Defendant advised A.P. that "if [she] ever told anybody," he would testify in court that "[she] wanted it all."

At trial, A.P. detailed some of the incidents. The earliest one occurred when she was five or six years old. A.P. had gone to bed "knocked out" after undergoing dental surgery. In the middle of the night, she woke up and observed defendant touching her vagina with his hand over her shorts and "running his penis along [her] stomach and leg area." He pressed her head down, inserted his penis into her mouth for "a couple minutes," and ejaculated. On another occasion, A.P. and defendant were in the living room when he kissed her neck and face and touched her vagina with his hand and penis. When he could not insert his penis into her vagina, he forced it into her mouth. Another time, defendant attempted to insert his penis into A.P.'s vagina. When she "started raising [her] voice," he stopped and told her that "he just loves [her]" and "wasn't trying to rape [her]." When A.P. was nine or 10 years old, defendant rubbed her vagina with his hand and tried to insert his penis into her vagina. Failing to do so, he forced his penis into her mouth. The last incident occurred when A.P. was a teenager. Defendant dragged her upstairs and the molestation "happened really fast."

### e. *Arrest and search*

On July 10, 2017, law enforcement apprehended defendant at his residence, conducted a search of the premises, and seized a computer. A forensic examination of the machine uncovered a user account belonging to "Anthony M."; software for a "Tor browser," which "tries to mask [the user's] IP address" and allows him or her to find pornography and other illicit material on the "dark web"; and one image of child pornography and 81 images of "child exploitation or child erotica" in the hard drive's unallocated space. The Tor browser was last accessed by "Anthony M." on July 5, 2017.

## II. Defense's case-in-chief

### a. *Testimony of defendant*

Defendant denied touching S.M. in an inappropriate manner and believed that she had been pressured by Ashley to falsely accuse him thereof. He also denied molesting M.W. and A.P. and downloading the images found on the confiscated computer.

### b. *Dr. Tiffany Grant*

Dr. Grant, a psychologist, reviewed the transcript of S.M.'s June 21, 2017 CART interview and opined that the interviewer asked leading questions.

Myers, 2021 WL 6050630, at *1–3 (footnote in original).

### III.

## STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged convictions arise out of the Tulare County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of AEDPA and is therefore governed by its provisions.

Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Lockyer v. Andrade, 538 U.S. 63, 70–71 (2003); Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id. In addition, the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) (quoting Wright v. Van Patten, 552 U.S. 120, 125 (2008)); Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v.

Musladin, 549 U.S. 70 (2006). If no clearly established Federal law exists, the inquiry is at an end and the Court must defer to the state court's decision. Musladin, 549 U.S. 70; Wright, 552 U.S. at 126; Moses, 555 F.3d at 760.

If the Court determines there is governing clearly established Federal law, the Court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, [the] clearly established Federal law." Lockyer, 538 U.S. at 72 (quoting 28 U.S.C. § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412–13; see also Lockyer, 538 U.S. at 72. "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405 (quoting Webster's Third New International Dictionary 495 (1976)). "A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." Id. If the state court decision is "contrary to" clearly established Supreme Court precedent, the state decision is reviewed under the pre-AEDPA de novo standard. Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc).

"Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411; see also Lockyer, 538 U.S. at 75–76. The writ may issue only "where there is no possibility fair minded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Richter, 562 U.S. at 102. In other words, so long as fair minded jurists could disagree on the correctness of the state court's decision, the decision cannot be considered unreasonable. Id. If the Court determines that the state court decision is objectively unreasonable, and the error is not

structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious effect on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

The Court looks to the last reasoned state court decision as the basis for the state court judgment. Wilson v. Sellers, 584 U.S. 122, 125 (2018); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this Court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99–100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

Where the state courts reach a decision on the merits but there is no reasoned decision, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98. This Court "must determine what arguments or theories . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id. at 102.

///

///

///

7

# IV.

## REVIEW OF CLAIMS

### A. Confrontation Clause

In his first claim for relief, Petitioner asserts that the trial court violated his right to confrontation under the Sixth Amendment when it failed to follow the procedures set forth in Maryland v. Craig, 497 U.S. 836 (1990), and California Penal Code section 1347. (ECF No. 1 at 14.) Respondent argues that the state court's rejection of the Confrontation Clause claim was not objectively unreasonable. (ECF No. 23.)

The California Court of Appeal denied the claim in a reasoned opinion. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the summary denial and examine the decision of the California Court of Appeal. See Wilson, 584 U.S. at 125.

In denying the Confrontation Clause claim, the California Court of Appeal stated:

**I. Section 1347**

    **a.** *Background*

#### i. <u>Motion and hearing</u>

On July 27, 2018, the prosecution filed a motion to allow S.M. to testify via closed-circuit television pursuant to section 1347. On August 2, 2018, the defense filed its opposition.

On August 6, 2018, the court conducted an Evidence Code section 402 hearing. The prosecution called Ashley to the witness stand. She testified that when she first informed S.M. a few months earlier about testifying against defendant, S.M. "immediately started crying and throwing a fit." The matter "got dropped" until court proceedings "started coming closer and closer." Starting around the end of June 2018, S.M. exhibited a drastic change in behavior. Whenever the topic of testifying against defendant was raised, she would threaten to kill herself, "drop on the floor and throw fits," and strike her head with "both of her hands," "against the wall," "against the bed railing," or "wherever." S.M. revealed that she hit herself "because it blocks out" "having to testify against [defendant]"; still "loves him and misses him"; and was "afraid that she's going to put him in jail." Ashley felt that S.M. would "breakdown" if she had to testify in defendant's presence. On the other hand, Ashley believed that S.M. would act differently if she were placed in a separate room because defendant "won't be right there in front of her" and "that pressure of thinking that she's going to be putting him in jail" "won't be on her."

After Ashley's testimony, the following colloquy transpired between the court, Defense Counsel John Sarsfield, and Deputy District Attorney Chelsea Wayt:

"THE COURT: I don't know if you want to present any expert testimony, but here's a thought running through my mind.

"We can do this one of two ways. One, we can try to have [S.M.] testify in here, but if she won't testify, then I want the whole thing set up so we can immediately move to the second phase, which would be the closed circuit television under [section] 1347, but, quite frankly, if that happens I think that would be a worse situation for the defense, but I'm going to – I give great weight to the fact that [Ashley] is scared for [S.M.'s] mental health, but I mean, if you want to call an expert – you have a doctor here or a counselor here,[6] I'm willing to hear what they have to say, but my thinking is, okay, well, we can get started and we can try, but if she melts down in front of this jury here on this – from the witness stand and she won't answer anything, I'm simply going to go into the 1347 mode, then I'll remove her from the courtroom. We'll set it up at some other place.

"We'll do the closed circuit TV, but how does that help your case?

"MR. SARSFIELD: I understand what you're saying. Could we take, like, a five-minute break to confer with Dr. Grant?

"THE COURT: Yes....

"MR. SARSFIELD: .... Thank you.

        "(Recess taken.)

"THE COURT: All right. Counsel, where are we?

"MR. SARSFIELD: So I understand where the Court is going with that. I think procedurally we have to be clear because there's the pending [section] 1347 motion, so what I would suggest would be that the Court deny it without prejudice and then we can proceed forward with what the Court suggested might happen....

"If you're inclined to grant their motion, but simply not give them the remedy that they're requesting, then I would offer Dr. Grant's testimony in an offer of proof.

"She would simply say that you cannot assess somebody's psychological, emotional or mental status based upon what we witnessed here today from [Ashley]. That's essentially all Dr. Grant would say, but if the Court denies their motion without prejudice, would [sic] leave to refile. As circumstances warrant, I think we're going and we can start tomorrow.

"THE COURT: Well, here's the way I see the 1347.

"Certainly, it's a – the minor's testimony involves an alleged sexual offense committed against the minor, that the testimony by the minor in the presence of the defendant – this is where I'm having my difficulty – the statute says 'would' and I see it as 'could' result in the child suffering serious emotional distress. So the child would essentially be unavailable as

---

[6] Dr. Grant, the defense's expert witness (see *ante*, at p. 7), was present at the motion hearing.

a witness. I'm not convinced that it would result there yet, but my finding is that it could.

"Now the mother is scared about the victim testifying in front of the defendant. It's too much pressure on her. She's talked about committing suicide now, acting out in a very self-destructive manner, hurting herself, loves her dad, misses him, somehow has put this all on her that if he can't come home she's going to be afraid. She's the one that would put him in jail forever, so I could see where this could be a situation causing the minor serious emotional distress. But based upon what I've heard, I can't say definitely that it would result, but I'm going to have a very short leash. [¶] ... [¶]

"... I'm going to have a very short leash on this. If [S.M.] will not even enter the courtroom, I'm going to find – I want it set up for when she is going to be called as a witness because I don't think she's going to testify. I think she's going to come up here – if she even comes in here, she's just going to sit here and sob and I think that's what's going to happen, and if that does happen or she won't even take the oath, I'm going to find her unavailable for purposes of this section and we're going to go right into the other section, but at this point I can't say that I find that this will happen.

"I'm finding in all probability it will happen, but I can't say for certain it will, and until I know for certain then I can't impose the restrictions or the procedures set up under this code, but I want it set up because I think that's exactly what's going to happen.

"We're going to have to break the minute she's called and take her to another room, whenever you have that set up or where you plan to do this. Hopefully we have another courtroom or something that we can do this, or somebody's office. So we have three, four cameras and the monitor in here and then we're going to move right into that situation. I'm going to be pretty liberal about the interpretation on behalf of [S.M.]. I don't want to traumatize this girl.

"Now, certainly [defendant]'s looking at life in prison so he has some rights too, and I have to try to balance these rights, and I can't make that final determination yet. [¶] ... [¶]

"MR. SARSFIELD: So procedurally – I hate to be the procedural horse, but procedurally, is the Court going to grant their motion or deny their motion without prejudice?

"THE COURT: I'm denying their motion at this point.

"MR. SARSFIELD: Thank you.

"THE COURT: But it's subject to a very, very short leash in terms of what happens if this victim [S.M.] – alleged victim [S.M.], if she won't even come in the courtroom, if she's a hysterical mess, if she comes in here and won't take the oath, it's not going to take much for me to say we're going to do this other procedure.

"MS. WAYT: And just to be super clear and prevent the defense from not having an opportunity to present any evidence, would the testimony from a doctor change the Court's opinion of having a very short leash regarding the 1347 motion, or are you satisfied with it 'could,' and if it does, then it 'would', versus needing a doctor to say that you can't determine her mental well-being?

"THE COURT: No. Your first statement.

"MS. WAYT: Okay. I know they have their doctor here. I didn't know if you wanted to hear testimony.

"MR. SARSFIELD: In light of the Court's ruling, I don't think we need to do that."

## ii. First day of trial

On August 8, 2018, prior to the start of trial, the following colloquy transpired between the court, Defense Counsel Marguerite Melo, and Deputy District Attorney Wayt:

"MS. MELO: .... [¶] ... [T]he discussions we've been having with respect to the videotape equipment and [S.M.] coming into the courtroom. I understand that the Court is going to force my client to be outside of her presence for her to come into the courtroom. I'm objecting to this. I believe that my client is entitled to see all the proceedings that occur here and that's part of those proceedings. He's entitled to see how this witness reacts upon entering the courtroom and he's allowed to be here to see this. [¶] ... [¶]

"THE COURT: All right. As far as the situation is I'm still trying to avert the 1347 aspect of this trial. I've been informed that [S.M.] [¶] ... [¶] ... [i]s down – on the second floor, the witness coordinator's office, and is refusing to come up here because she knows the defendant, Mr. Myers, is here. Her fears are certainly understandable to me and so at a break or off the record I'm going to ask that Mr. Myers step out into the foyer area here behind the closed door and allow [S.M.] to come in and at least look at the courtroom. It is my hope that that would give her enough confidence then to bring Mr. Myers back in, have her try to testify here in the courtroom.

"Now, if that doesn't work, then we're going to do the 1347 proceedings. So I note your objection, but this is going to take all of five seconds and it's while we're off the record. The jury will not be here. They will not see any of this.

"Ms. Wayt?

"MS. WAYT: Yes, it's my understanding that she's outside the courtroom and that's what I'm trying to do is circumvent having to use the 1347.

"THE COURT: So over Ms. Melo's objection, Deputy ... , would you simply take him to the holding cell and this will be something for about ten seconds. Thank you. [¶] ... [¶] .... Let's bring [S.M.] in.

1            "Let the record reflect that [S.M.] has been here in the courtroom.

2            "MS. WAYT: .... The victim advocate from the District Attorney's office as well as CASA[7] advocate was also present.

3

4            "THE COURT: Let's bring Mr. Myers back out. This whole situation took less than five minutes. Fair enough?

5            "MS. MELO: Yes.

6            "THE COURT: Mr. Myers has rejoined us. Anything else we need to take up before I bring the jury? ...

7

8            "MS. MELO: Nothing to put on the record, Your Honor.

             "MS. WAYT: I think we can proceed."

9

10   The jurors entered the courtroom and were preinstructed. After its opening statement, the prosecution called S.M. as its first witness. Thereafter, the following colloquy transpired between the court and the attorneys:

11

12         "MS. MELO: Objection, Your Honor. The entire theater that's going on out there.

13         "MS. WAYT: At this point I don't believe she's willing to come into the courtroom. I don't know – if I can have a few minutes to see if I can try.

14

15         "THE COURT: Take a few minutes. I'm going to have to conduct a couple things outside your presence so I need for you to retire to the jury room while we take up these preliminary matters. [¶] ... [¶]

16

17              "(Break in proceedings.)

18         "MR. SARSFIELD: As an offer, somebody, I don't know if it was the mother of the witness, was heard outside the doors of the courtroom saying something to the effect, 'She's scared, she's scared, she's scared,' that needs to be noted in the record.

19

20         "THE COURT: Well, I didn't hear that. Did you hear that, Ms. Wayt?

21         "MS. WAYT: I was so concentrated on her. She had her feet planted. She was on the ground. She wasn't coming in.

22

23         "MR. SARSFIELD: As an officer of the Court I will swear under penalty of perjury that's what I heard.

24         "THE COURT: I'm just saying I didn't hear it.

25         "MS. WAYT: I will say that the mother was not present right there. The person that was right there was the advocate from CASA. The mom was down the hall. She's been instructed to be down the hall. And then her grandmother is here, but I think she was just trying to hold her hand. Honestly, I wasn't listening. I didn't – I was listening to her. She said, 'I

26

27

---

28  [7] Court Appointed Special Advocate.

don't want to go in there. I don't want to go in there.' Would it be possible if I suggest maybe she come in and get seated before we bring the jury out?

"THE COURT: Absolutely.

"MS. WAYT: I'll try that. [¶] ... [¶]

"THE COURT: All right. We've been in recess for about ten minutes.

"What happened, for the record, is that Ms. Wayt indicated she was going to call [S.M.], went outside to get her. Next thing I know there was some type of commotion as the doors opened up. Some words were spoken. I didn't hear them. Counsel indicated there was words to the effect of, 'I'm scared, I'm scared.'

"Is that right, Counsel?

"MR. SARSFIELD: Yes, Your Honor, spoken by an adult female voice.

"THE COURT: So we have sent the jury into the jury room. We're meeting outside of the presence of the jury. I've sent Ms. Wayt out to try to find out how we're going to proceed.

"Bring me up to date.

"MS. WAYT: Your Honor, my – one of the victim advocates went downstairs to grab, like, a little, like, color changing ball that she can hold onto, you know, maybe distract her a little bit during – while she's up there and not focus on what's happening. She's coming back up.

"And then [S.M.] said she'd like to try to come back in, and we'd ask that the advocate – the CASA advocate be able to sit up there with her and we'll try to do this and then bring the jury out.

"THE COURT: Any thoughts, Counsel?

"MS. MELO: We'll see what happens.

"THE COURT: Okay.

"MS. WAYT: As soon as they get back I'll bring her in so we can get situated."

S.M. and the jury entered the courtroom, respectively. On direct examination, the following exchange occurred:

"Q. Hi, [S.M.]. I know, I know you want your mom.

"A. I want my mommy. [¶] ... [¶]

"Q. Here's the microphone.

"A. I want my mommy.

1    "Q. I know. It's not fun to be in here, right?

2    "A. I don't want to. I want mommy. Please.

3    "Q. I'm just going to ask you a few questions.

4    "A. No, I don't want to do that.

5    "Q. I know it's not that fun to be in here, right?

6    "A. I don't want to.

7    "Q. Can you try to take a really deep breath for me? [¶] How come you
     don't want to be in here?
8
     "A. I don't want to be in here.
9
     "Q. Are you scared?
10
     "A. I want my mommy.
11
     "Q. Have you ever been in a room like this before?
12
     "A. I want my mommy. I don't want to be here. Please, don't let me.
13
     "Q. Can I just ask you a few questions and then we'll get out of here[?]
14   It's some pretty easy questions like, how old are you?" (Boldface
     omitted.)
15
     S.M. answered questions about her ability and willingness to testify truthfully as
16   well as her age, birthday, grade, school, extracurricular activities, family
     members, and pets. The following exchange occurred when the prosecutor
17   inquired about a family dog:

18   "Q. Did you ever have a dog?

19   "A. Yes.

20   "Q. What kind of dog did you have?

21   "A. English Mastiff. [¶] ... [¶]

22   "Q. Okay. What happened to [the dog]?

23   "A. He got – I don't know. I don't want to tell.

24   "Q. How come?

25   "A. I just don't want to. I just don't want to.

26   "Q. And how come you don't want to talk about [the dog]?

27   "A. Because I don't want to.

28   "Q. Where does [the dog] live?

1

"A. I don't want to talk about it.

2

"Q. Okay. Why don't you want to talk about where [the dog] lives?

3

"A. Because I don't want to talk about it.

4

"Q. Does it make you sad to talk about it?

5

"A. Yeah.

6

"Q. How come it makes you sad to talk about it?

7

"A. I don't want – I don't know. Stop asking me such hard questions. [¶]

8

... [¶]

9

"Q. What kind of stuff do you do with [the dog]?

10

"A. He's not there anymore.

11

"Q. He's not in your family anymore?

12

"A. Yeah.

13

"Q. How does that make you feel that he's not in your family anymore?

14

"A. Very sad.

15

"Q. Do you love [the dog]?

16

"A. Yes.

17

"Q. Do you miss [the dog]?

18

"A. Yes.

19

"Q. Where does [the dog] live now?

20

"A. I don't want to talk about that. [¶] ... [¶]

21

"Q. Okay. Do you think you'll get to see [the dog] some day?

22

"A. No.

23

"Q. How come?

24

"A. I don't want to talk about that.

25

"Q. Okay. So you don't want to answer the question about [the dog]?

26

"A. Yes. Nothing about [the dog].

27

"Q. Is there anybody else that you don't want to talk about?

28

"A. Yeah.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

"Q. Who?

"A. Huh-uh. Nobody.

"Q. Nobody.

"A. No.

"Q. So since [the dog] isn't part of your family anymore, are there other people that aren't part of your family ... anymore?

"A. I want to go. I want to go.

"Q. Okay. Now, I won't ask you about them right now, but did something happen that makes it hard for you to talk about?

"A. I don't want to.

"Q. You just have to answer yes or no.

"A. Stop, please.

"Q. Okay.

"A. I don't want to anymore."[8] (Boldface omitted.)

Wayt briefly changed topics. The following exchange then occurred:

"Q. Okay. So I'm just going to ask you a few other questions and then we'll try to wrap it up. Okay?

"A. Okay.

"Q. I know that there's some things that you don't want to talk about because you told me that, right?

"A. Yeah.

"Q. And when you say you don't want to talk about it, is it because – why don't you want to talk about it?

"A. I don't want to talk about it.

"Q. Okay.

"A. Please. I don't want to talk about it.

"Q. Okay. I'm not going to – I won't ask you about it just yet. I want to ask you why not –

"A. I want to go home.

---

[8] The record indicates that the dog belongs to defendant.

"Q. You want to go home?

"A. Uh-huh. I don't want to.

"Q. Are you scared to talk about it?

"A. Uh-huh.

"Q. Are you scared that something bad is going to happen if you talk about it?

"A. I really want to go home. [¶] ... [¶]

"Q..... [¶] Okay, so can you just tell me besides [the dog], who's not in your family anymore?

"A. Huh-uh. No." (Boldface omitted.)

The court interjected:

"Ms. Wayt, I've seen enough. [¶] ... [¶] ... So we're going to take a quick recess and I need for the jury to go back into the jury room, and we're going to try a different procedure."

After the jurors exited the courtroom, the following colloquy transpired between the court and Sarsfield:

"THE COURT: .... [¶] ... [A]t this point it's clear to me this witness will not testify in the presence of [defendant]. The body language, when she would roll herself up almost into a ball, shake her head vigorously. She does not want to be here, so I'm not even sure she'll testify under 1347 given what's going on here, but that's what we're going to do .... [¶] ... [¶]

"MR. SARSFIELD: ... [¶] ... [¶] Yes, it's certainly true that [S.M.] was behaving in a way that Your Honor described on the witness stand and was distressing for all to see, but we don't know whether that's because of the presence of the defendant, or from our point of view, that the witness has been coached and coerced by her mother into saying things that are not true. We believe that is an alternative explanation as to her behavior and that would be explored prior to making a 1347 order.

"Additionally, because the Court denied the earlier 1470 motions, that essentially resets the clock, and we're entitled to notice and opportunity to be heard on the grounds of – the alleged grounds for the basis of the motion.

"THE COURT: I will make two points, number one, when your client was out of the courtroom and she came in, she didn't have any problem being in here. She got on the witness stand. She felt – appeared to be very much at ease. In fact, when she left, she was skipping. The only thing that changed between when she was in here 30 minutes ago and when she's in here right now is the presence of your client. And the fact that you were put on notice on Friday of last week that they intended to proceed this way, I denied it because they didn't make a clear showing, but I told you you were on a short leash. If they made the showing at the hearing when

17

she testified, I intended to grant it, so don't say that you don't have notice because that's not accurate, Counsel.

"MR. SARSFIELD: Well, actually, we would be given opportunity to question the child in regards to the 1347 ourselves, and we've been denied that because it is entirely possible that Ms. Melo can talk to her and get her to admit that her mother is pressuring her. That would explain all of this.

"THE COURT: You can do that by way of closed circuit TV.

"MR. SARSFIELD: At that point the bell has already been rung because the Court has already instituted the mechanism for testimony, which we believe is a violation of the confrontation laws.

"THE COURT: Have you been in the courtroom and saw her? She won't answer any question. Do you think she's going to answer Ms. Melo's questions? She won't answer with Ms. Wayt, and they obviously have some kind of relationship. You have to be on another planet to think that she's going to answer Ms. Melo's questions.

"MR. SARSFIELD: Well, personal assertions aside, I have been in the courtroom, Your Honor, and she answered a great deal of information. She talked about her dog, her cat. She talked about her teacher. She was responsive to many, many questions.

"Essentially, the only questions that she didn't answer was when Ms. Wayt was going down the road of, who else had you lived with at some previous time, or words to that effect. That's when the child began to manifest some difficulty and there are multiple explanations as to why that might be, one of which, admittedly, is that the defendant could be guilty, but another one is that the mother, which we believe to be the case, is pressuring her to essentially commit perjury by proxy and we're entitled to examine on that issue.

"THE COURT: The only questions she answered were fluff questions. She answered no substantive questions so your objection is noted. File your writ."

### iii. Second day of trial

On August 9, 2018, outside the presence of the jury and before S.M. testified via closed-circuit television, the court remarked:

"I'm looking at [section] 1347. All right. As to the order allowing 1347 procedures, the Court will make – in addition to all the comments I made yesterday under 1347, looks like ... I have to make five different findings outside the presence of the jury. I'm making a brief statement on the record in support of this order that the minor attempted to testify yesterday. She came – well, I'll just incorporate all the findings I made yesterday, but it's clear to me she will not testify in this matter while the defendant is in the courtroom. Between the testimony of the mother when we did the in limine motions and [Evidence Code section] 402 hearings about her talking about suicide and all the other things when she found out she was going to have to testify against her father, loves her father, doesn't want to be the one responsible for sending him to jail, and her total

meltdown yesterday on the witness stand where she rolled up, pulled her legs up and wouldn't say anything other than 'I want my mommy,' and, 'I don't want to be here,' the Court is absolutely clear that she will not testify in front of her father in this proceeding. So that is why I'm allowing the 1347 procedure."

**b. *Pertinent law***

" 'The Sixth Amendment to the United States Constitution, made applicable to the States via the Fourteenth Amendment, [citation], provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." ... [I]t guarantees a defendant's right to confront those "who 'bear testimony' " against him.' [Citation.]" (*People v. Powell* (2011) 194 Cal.App.4th 1268, 1281 (*Powell*).) "The confrontation clause not only affords defendants the right to personally examine adverse witnesses, it also ' "(1) insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the 'greatest legal engine ever invented for the discovery of truth'; [and] (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility." [Citation.] [¶] The combined effect of these elements of confrontation ... serves the purposes of the Confrontation Clause by ensuring that evidence admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo-American criminal proceedings. [Citations.]' " (*In re Ruedas* (2018) 23 Cal.App.5th 777, 786, quoting *Maryland v. Craig* (1990) 497 U.S. 836, 845-846 (*Craig*).)

The confrontation right "is not so absolute ... that it always requires the accuser and accused to be in the same room." (*Powell, supra*, 194 Cal.App.4th at p. 1281.) " '[A] defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured.' " (*People v. Arredondo* (2019) 8 Cal.5th 694, 701 (*Arredondo*), quoting *Craig, supra*, 497 U.S. at p. 850.)

"[T]he United States Supreme Court held that 'a State's interest in the physical and psychological well-being of child abuse victims may be sufficiently important to outweigh, at least in some cases, a defendant's right to face his or her accusers in court.' " (*Powell, supra*, 194 Cal.App.4th at p. 1281, quoting *Craig, supra*, 497 U.S. at p. 853.) "[U]pon 'an adequate showing of necessity, the state interest in protecting child witnesses from the trauma of testifying in a child abuse case is sufficiently important to justify the use of a special procedure that permits a child witness in such cases to testify at trial against a defendant in the absence of face-to-face confrontation with the defendant.' " (*Arredondo, supra*, 8 Cal.5th at p. 701, quoting *Craig, supra*, at p. 855.) " '[T]he requisite finding of necessity must ... be a case-specific one: The trial court must hear evidence and determine whether use of the [alternative] procedure is necessary to protect the welfare of the particular child witness who seeks to testify. [Citations.]' " (*Arredondo, supra*, at p. 702, quoting *Craig, supra*, at pp. 855-856.) In addition, "[a]n adequate showing that the defendant's presence may cause emotional trauma is required: 'The trial court must ... find that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant.' " (*Powell, supra*, at p. 1283, quoting *Craig, supra*, at p. 856.)

19

" '[W]here necessary to protect a child witness from trauma that would be caused by testifying in the physical presence of the defendant, at least where such trauma would impair the child's ability to communicate, the Confrontation Clause does not prohibit use of a procedure that, despite the absence of face-to-face confrontation, ensures the reliability of the evidence by subjecting it to rigorous adversarial testing and thereby preserves the essence of effective confrontation.' " (*Arredondo, supra*, 8 Cal.5th at pp. 701-702, quoting *Craig, supra*, 497 U.S. at p. 857.) A procedure may provide sufficient assurances where it preserves the other elements of the confrontation right, e.g., " '[t]he child witness must be competent to testify and must testify under oath' "; " 'the defendant retains full opportunity for contemporaneous cross-examination' "; and " 'the judge, jury, and defendant are able to view ... the demeanor (and body) of the witness as he or she testifies.' " (*Arredondo, supra*, at p. 701, quoting *Craig, supra*, at p. 851; accord, *People v. Bharth* (2021) 68 Cal.App.5th 801, 815; see *Craig, supra*, at p. 851 ["Although we are mindful of the many subtle effects face-to-face confrontation may have on an adversary criminal proceeding, the presence of these other elements of confrontation – oath, cross-examination, and observation of the witness' demeanor – adequately ensures that the testimony is both reliable and subject to rigorous adversarial testing in a manner functionally equivalent to that accorded live, in-person testimony."].)

"In section 1347, the Legislature sought to make closed-circuit television testimony available to child witnesses under circumstances that, in the lawmakers' view, would preserve a defendant's Sixth Amendment confrontation rights as outlined in *Craig*." (*Powell, supra*, 194 Cal.App.4th at p. 1282.) Section 1347, subdivision (a) provides:

> "It is the intent of the Legislature in enacting this section to provide the court with discretion to employ alternative court procedures to protect the rights of a child witness, the rights of the defendant, and the integrity of the judicial process. In exercising its discretion, the court necessarily will be required to balance the rights of the defendant or defendants against the need to protect a child witness and to preserve the integrity of the court's truthfinding function. This discretion is intended to be used selectively when the facts and circumstances in an individual case present compelling evidence of the need to use these alternative procedures."

Section 1347, subdivision (b) provides in pertinent part:

> "Notwithstanding any other law, the court in a criminal proceeding, upon written notice by the prosecutor made at least three days prior to the date of the preliminary hearing or trial date on which the testimony of the minor is scheduled, or during the course of the proceeding on the court's own motion, may order that the testimony of a minor 13 years of age or younger at the time of the motion be taken by contemporaneous examination and cross-examination in another place and out of the presence of the judge, jury, defendant or defendants, and attorneys, and communicated to the courtroom by means of closed-circuit television, if the court makes all of the following findings:

> > "(1) The minor's testimony will involve a recitation of the facts of any of the following: [¶] (A) An alleged sexual offense committed on or with the minor. [¶] ... [¶]

"(2) The impact on the minor of one or more of the factors enumerated in subparagraphs (A) to (E), inclusive, is shown by clear and convincing evidence to be so substantial as to make the minor unavailable as a witness unless closed-circuit testimony is used. [¶] (A) Testimony by the minor in the presence of the defendant would result in the child suffering serious emotional distress so that the child would be unavailable as a witness. [¶] ... [¶]

"In making the determination required by this section, the court shall consider the age of the minor, the relationship between the minor and the defendant or defendants, any handicap or disability of the minor, and the nature of the acts charged. The minor's refusal to testify shall not alone constitute sufficient evidence that the special procedure described in this section is necessary to obtain the minor's testimony.

"(3) The equipment available for use of closed-circuit television would accurately communicate the image and demeanor of the minor to the judge, jury, defendant or defendants, and attorneys."

### c. *Standard of review*

"In accordance with th[e] statutory language [of section 1347, subdivision (a)], the applicable standard of review for the trial court's order allowing defendant's daughter to testify via closed-circuit television is abuse of discretion." (*Powell, supra*, 194 Cal.App.4th at p. 1283.) "[I]n determining whether the court abused its discretion, we look for substantial evidence in support of its finding." (*Id.* at p. 1284, fn. 6; see *People v. Aispuro* (2007) 157 Cal.App.4th 1509, 1511 ["For evidence to be 'substantial' it must be of ponderable legal significance, reasonable in nature, credible and of solid value."].) "[W]hen reviewing a [finding] under the substantial evidence standard, 'an appellate court should defer to the factual determinations made by the trial court' .... [Citations.]" (*People v. Vivar* (2021) 11 Cal.5th 510, 528, fn. 7.)

### d. *Analysis*

In the instant case, at a pretrial hearing on the prosecution's section 1347 motion, Ashley described S.M.'s alarming reactions to the mere idea of testifying against defendant, including throwing temper tantrums, threatening suicide, and inflicting self-harm. She testified that S.M. still loved and missed defendant and feared that her testimony would lead to her father's imprisonment. Ashley worried that S.M. would "breakdown" if she had to testify in defendant's proximity. Although the court gave "great weight" to Ashley's testimony and remarked that it "could see where this could be a situation causing [S.M.] serious emotional distress," it denied the motion without prejudice because it "c[ould]n't impose the restrictions or the procedures set up under [section 1347]" "until [it] kn[e]w for certain" that defendant's presence would traumatize S.M. and "c[ould]n't make that final determination yet." The court informed the parties that it would "have a very short leash" at trial and order the use of closed-circuit television if S.M. "will not even enter the courtroom," "comes in here and won't take the oath," "[i]s just going to sit here and sob," and/or "[i]s a hysterical mess." In settling on this arrangement, the court expressly recognized its obligation to balance defendant's confrontation right against the need to protect S.M.'s welfare. (See § 1347, subd. (a).)

21

Before the commencement of trial, the court became aware that S.M. refused to enter the courtroom due to defendant's presence. In attempting to "avert the [section] 1347 aspect of this trial," it had the bailiff relocate defendant to a holding cell "behind [a] closed door" for approximately five minutes to let S.M. "come in and at least look at the courtroom" and develop "enough confidence" to testify. During this period, the court observed that S.M., who was accompanied by a CASA representative, "didn't have any problem being in here"; "got on the witness stand" and "appeared to be very much at ease"; and exited the room "skipping." However, when trial commenced and the prosecution called S.M. as its first witness, S.M. once again refused to enter the courtroom. Defense Counsel Sarsfield attested that he heard "an adult female voice" outside the courtroom saying that S.M. was "scared." Following a recess and some coaxing by Deputy District Attorney Wayt, S.M. took the witness stand with the CASA representative by her side. However, on direct examination, she continually stated that she "want[ed] [her] mommy" and wanted to go home and was nonresponsive to questions relating to defendant. The court observed that S.M. "would roll herself up almost into a ball" and "shake her head vigorously." It halted the examination and called another recess. Outside the presence of the jury, the court ordered the use of closed-circuit television. Based on Ashley's testimony at the motion hearing and its own observations of S.M. before and during trial, the court found by clear and convincing evidence that the child would be traumatized by defendant's presence. It rejected Sarsfield's assertion that S.M.'s behavior could just as likely be attributed to being "coached and coerced by her mother into saying things that are not true."

We find no abuse of discretion regarding the manner in which the court determined that use of closed-circuit television was appropriate. While it initially denied the prosecution's section 1347 motion (without prejudice), the court judiciously planned for S.M.'s potential "meltdown" on the witness stand and informed the parties of his intent to order the use of closed-circuit television if that contingency came to pass. We note that the language of section 1347, subdivision (b) explicitly contemplates orders made "during the course of the [criminal] proceeding." (Cf. *Powell, supra*, 194 Cal.App.4th at p. 1278 ["A trial court abuses its discretion when its ruling falls outside the bounds of reason ...."].) Before the start of trial on day one, S.M. exhibited an unwillingness to testify because of defendant's presence. The court temporarily removed defendant from the courtroom to allow S.M. (with the CASA representative) to visit and acclimate to the setting, an approach that seemed effective. She left the courtroom without incident and defendant was subsequently brought back in. However, when the prosecution called S.M. to the witness stand, she was apparently petrified and refused to enter the courtroom. She was somehow persuaded to take the stand, but her pleas and body language made evident her inability to testify in front of defendant. Substantial evidence, i.e., Ashley's motion hearing testimony and the court's observations of S.M. before and during trial, supported the case-specific findings that S.M. would be traumatized by a face-to-face confrontation with defendant and use of closed-circuit television was necessary to protect her welfare. (See *People v. Fairbank* (1997) 16 Cal.4th 1223, 1254 [substantial evidence may consist of trial court's own observations].)

On appeal, defendant asserts that "expert testimony in a separate hearing is generally required" (italics omitted) before a court can conclude that "the child would suffer emotional trauma if forced [to] testify in [the accused]'s presence." Nothing on the face of section 1347 supports this claim. (See *People v. Boyd* (1979) 24 Cal.3d 285, 294 ["[W]hen the Legislature intends otherwise, it expresses its purpose in unmistakable words."].)

Defendant mentions Evidence Code section 240, which reads in pertinent part:

> "(a) ... '[U]navailable as a witness' means that the declarant is any of the following: [¶] ... [¶] (3) Dead or unable to attend or to testify at the hearing because of then-existing physical or mental illness of infirmity. [¶] ... [¶]

> "(c) Expert testimony that establishes that physical or mental trauma resulting from an alleged crime has caused harm to a witness of sufficient severity that the witness is physically unable to testify or is unable to testify without suffering substantial trauma may constitute a sufficient showing of unavailability pursuant to paragraph (3) of subdivision (a). As used in this section, the term 'expert' means a physician and surgeon, including a psychiatrist, or any person described by subdivision (b), (c), or (e) of [Evidence Code s]ection 1010.[9]

>> "The introduction of evidence to establish the unavailability of a witness under this subdivision shall not be deemed procurement of unavailability, in absence of proof to the contrary."

"The court's role in construing a statute is to 'ascertain the intent of the Legislature so as to effectuate the purpose of the law.' [Citations.] In determining the Legislature's intent, a court looks first to the words of the statute. [Citation.] '[I]t is the language of the statute itself that has successfully braved the legislative gauntlet.' [Citation.] [¶] When looking to the words of the statute, a court gives the language its usual, ordinary meaning. [Citations.] If there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs. [Citations.]" (*People v. Snook* (1997) 16 Cal.4th 1210, 1215.) Here, subdivision (c) of Evidence Code section 240 states that expert testimony "may" constitute a sufficient showing of unavailability. "Absent any indicia of a contrary legislative intent, the word 'shall' is ordinarily construed as mandatory, whereas 'may' is ordinarily construed as permissive. [Citation.] This is especially so where both 'shall' and 'may' are used in the same statute. [Citations.]" (*In re J.N.* (2006) 138 Cal.App.4th 450, 457, fn. 4; see *People v. Alcala* (1992) 4 Cal.4th 742, 780 [rejecting the defendant's contention that a witness's unavailability on the basis of mental infirmity could be established only by expert medical evidence and not by the testimony of said witness].) We are also unpersuaded by the cases cited in defendant's brief, which either (1) predated the enactment of section 1347, which took effect on May 20, 1985 (*Seering v. Department of Social Services* (1987) 194 Cal.App.3d 298, 306, fn. 3); (2) are from out of state and have no binding effect on California courts (see *People v. Troyer* (2011) 51 Cal.4th 599, 610); (3) were factually inapposite; and/or (4) did not stand for the proposition that section 1347 findings must be premised on expert testimony.

Myers, 2021 WL 6050630, at *3–13 (footnotes in original).

The Sixth Amendment's Confrontation Clause, made applicable to the states by the Fourteenth Amendment, Pointer v. Texas, 380 U.S. 400, 403 (1965), provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses

---

[9] Subdivisions (b), (c), and (e) of Evidence Code section 1010 refer to licensed psychologists, licensed clinical social workers engaged in applied psychotherapy of a nonmedical nature, and licensed marriage and family therapists, respectively.

1   against him," U.S. Const. amend. VI. "[T]he Confrontation Clause guarantees the defendant a

2   face-to-face meeting with witnesses appearing before the trier of fact." Coy v. Iowa, 487 U.S.

3   1012, 1016 (1988). The Supreme Court "ha[s] never held, however, that the Confrontation

4   Clause guarantees criminal defendants the *absolute* right to a face-to-face meeting with witnesses

5   against them at trial." Maryland v. Craig, 497 U.S. 836, 844 (1990).

> [I]f the State makes an adequate showing of necessity, the state interest in
> protecting child witnesses from the trauma of testifying in a child abuse case is
> sufficiently important to justify the use of a special procedure that permits a child
> witness in such cases to testify at trial against a defendant in the absence of face-
> to-face confrontation with the defendant.

9   Craig, 497 U.S. at 855. "The requisite finding of necessity must of course be a case-specific one:

10   The trial court must hear evidence and determine whether use of the one-way closed circuit

11   television procedure is necessary to protect the welfare of the particular child witness who seeks

12   to testify." Id. "The trial court must also find that the child witness would be traumatized, not by

13   the courtroom generally, but by the presence of the defendant." Id. at 856. "Finally, the trial

14   court must find that the emotional distress suffered by the child witness in the presence of the

15   defendant is more than *de minimis, i.e.,* more than 'mere nervousness or excitement or some

16   reluctance to testify[.]'" Id.

17   The Court finds that the appellate court's denial of the Confrontation Clause claim was

18   not objectively unreasonable. The trial court heard evidence at a pretrial hearing on the

19   prosecution's section 1347 motion. The trial court also personally observed S.M., noting that

20   when S.M. was brought into the courtroom outside Petitioner's presence, "she didn't have any

21   problem being in here. She got on the witness stand. She felt – appeared to be very much at ease.

22   In fact, when she left, she was skipping." (5 RT 180–81.) In contrast, when S.M. was called to

23   the witness stand, "she would roll herself up almost into a ball, shake her head vigorously," and

24   the "only thing that changed . . . is the presence of" Petitioner. (5 RT 179, 181.) The trial court

25   heard evidence, determined that S.M. would be traumatized by the presence of Petitioner, and

26   found that the emotional distress suffered by S.M. in the presence of Petitioner was more than *de*

27   *minimis*—meeting the requirements of Craig with respect to the finding of necessity.

28   ///

Petitioner appears to argue that to satisfy "the *Craig* standard" "there must be a specific finding that one-way CCTV is necessary to protect the child witness and obtain the testimony rather than two-way CCTV." (ECF No. 26 at 15.) Although that may be required under California Penal Code section 1347,[10] such a finding is not required by <u>Craig</u> or federal constitutional law. In fact, the Supreme Court specifically "decline[d] to establish, as a matter of federal constitutional law, any such categorical evidentiary prerequisites for the use of the one-way television procedure," such as a requirement to "explore less restrictive alternatives to the use of the one-way closed circuit television procedure." <u>Craig</u>, 497 U.S. at 860.

If the child witness "testified under oath, w[as] subject to full cross-examination, and w[as] able to be observed by the judge, jury, and defendant as they testified, we conclude that, to the extent that a proper finding of necessity has been made, the admission of such testimony would be consonant with the Confrontation Clause." <u>Craig</u>, 497 U.S. at 857. Here, S.M. testified under oath, was subject to cross-examination, and was able to be observed by the judge, jury, and Petitioner as she testified. Petitioner contends that any cross-examination was rendered "essentially meaningless." (ECF No. 1 at 66.) However, "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." <u>Delaware v. Fensterer</u>, 474 U.S. 15, 20 (1985) (per curiam) (emphasis in original).

Petitioner has not demonstrated that "no 'fairminded juris[t]' could have reached the same judgment as the state court." <u>Shinn v. Ramirez</u>, 596 U.S. 366, 378 (2022) (alteration in original) (quoting <u>Harrington</u>, 562 U.S. at 102). Accordingly, the Court finds that the state court's rejection of the Confrontation Clause claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood

---

[10] To the extent Petitioner asserts that the trial court failed to comply with California Penal Code section 1347, the Court finds that such a claim is an issue of state law that is not cognizable in federal habeas corpus. <u>See</u> <u>Wilson v. Corcoran</u>, 562 U.S. 1, 5 (2010) (per curiam) ("[I]t is only noncompliance with federal law that renders a State's criminal judgment susceptible to collateral attack in the federal courts."); <u>Estelle v. McGuire</u>, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.")

and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Therefore, Petitioner is not entitled to habeas relief on his first claim, and it should be denied.

### B.  Due Process and Fair Trial

In his second claim for relief, Petitioner asserts that the trial court violated his right to due process and a fair trial with respect to the following aspects of its handling of S.M. as a witness:

> when it failed to follow the procedures set forth in Craig, supra, and California Penal Code section 1347; denied Petitioner an opportunity to determine whether S.M. should testify at all at trial because she was an unavailable witness (*Cal. Evid. Code § 240(a)(3), (6) and (c)*), or not competent to testify (*Cal. Evid. Code § 701, subd. (a)(1), (2)*), before ruling whether she should testify via CCTV; denied Petitioner's request for discovery of the identities and reports of the counsel's or therapists treating S.M. to determine the availability and competency as a witness and to determine why S.M. could not testify in court;[11] compelled S.M. to testify before the jury to determine her availability and whether she should testify via CCTV; and failed to declare a mistrial after S.M.'s two emotional outbursts in front of the jury.

(ECF No. 1 at 28.) Respondent argues that the state court was not objectively unreasonable in rejecting the fair trial claim. (ECF No. 23 at 34.)

The California Court of Appeal denied the fair trial claim in a reasoned opinion. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the summary denial and examine the decision of the California Court of Appeal. See Wilson, 584 U.S. at 125.

In denying the fair trial claim, the California Court of Appeal stated:

> Incongruously, defendant—who sought to maintain a physical, face-to-face confrontation with S.M. by virtue of his opposition to the prosecution's section 1347 motion—suggests that the court should not have had S.M. testify in the

---

[11] A petitioner in state custody who is proceeding with a petition for writ of habeas corpus must exhaust state judicial remedies. 28 U.S.C. § 2254(b)(1). A petitioner can satisfy the exhaustion requirement by providing the highest state court with a full and fair opportunity to consider each claim before presenting it to the federal court. O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); Duncan v. Henry, 513 U.S. 364, 365 (1995); Picard v. Connor, 404 U.S. 270, 276 (1971). To provide the highest state court the necessary opportunity, the petitioner must "fairly present" the claim with "reference to a specific federal constitutional guarantee, as well as a statement of the facts that entitle the petitioner to relief." Duncan, 513 U.S. at 365; Gray v. Netherland, 518 U.S. 152, 162-63 (1996). "Fair presentation requires that the petitioner 'describe in the state proceedings both the operative facts and the federal legal theory on which his claim is based so that the state courts have a "fair opportunity" to apply controlling legal principles to the facts bearing upon his constitutional claim.'" Davis v. Silva, 511 F.3d 1005, 1009 (9th Cir. 2008) (citation omitted). To the extent Petitioner asserts a fair trial claim with respect to the denial of an opportunity to determine whether S.M. should testify at all at trial because she was an unavailable witness or not competent to testify and the denial of Petitioner's discovery request, the Court previously found these alleged errors were "not mentioned at all in the petition for review filed in the California Supreme Court." (ECF No. 19 at 6.) The Court cannot grant habeas relief on unexhausted claims. See 28 U.S.C. § 2254(b)(1).

courtroom "because witnessing the emotional state of an eight year old child on the witness stand repeatedly calling out for her mommy, expressing fear, and literally begging to go home, forever tainted this jury from the inception of trial thereby fundamentally and prejudicially altering the integrity of the trial and the due process to which [he] was entitled." Defendant is not entitled to "have his cake and eat it too." (*People v. Borland* (1996) 50 Cal.App.4th 124, 127.)[12]

Myers, 2021 WL 6050630, at *14 (footnote in original).

"The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations. The rights to confront and cross-examine witnesses . . . have long been recognized as essential to due process." Chambers v. Mississippi, 410 U.S. 284, 294 (1973). "The Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment," such as the Confrontation Clause. Strickland v. Washington, 466 U.S. 668, 684–85 (1984). Therefore, to the extent Petitioner's fair trial claim is based on the procedure used by the trial court regarding S.M.'s testimony, the Court finds that the state court was not objectively unreasonable in denying the claim for the reasons set forth in section IV(A), *supra*. See Caplin & Drysdale v. United States, 491 U.S. 617, 633 (1989) (stating the Court is "not sure that" a Fifth Amendment argument "adds anything to petitioner's Sixth Amendment claim" or that "the Fifth Amendment provides some added protection not encompassed in the Sixth Amendment's more specific provisions").

With respect to the trial court's failure to declare a mistrial after S.M.'s emotional testimony in the courtroom, the Supreme Court has "explained that trial judges may declare a mistrial 'whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity' for doing so," or "when there is a 'high degree' of necessity." Renico v. Lett, 559 U.S. 766, 773–74 (2010) (some internal quotation marks omitted) (first quoting United States v. Perez, 22 U.S. (9 Wheat.) 579, 580 (1824); and then quoting Arizona v. Washington, 434 U.S. 497, 506 (1978)). "The decision to declare a mistrial is left to the 'sound discretion' of the judge, but 'the power ought to be used with the greatest caution, under urgent circumstances,

---

[12] Having examined the merits, we need not address (1) the Attorney General's claim of forfeiture; or (2) defendant's claim of ineffective assistance of counsel, which is premised on a finding of forfeiture.

and for very plain and obvious causes.'" Renico, 559 U.S. at 774 (quoting Perez, 22 U.S. (9 Wheat.) at 580). "Because judicial application of a general standard 'can demand a substantial element of judgment,' the more general the rule provided by the Supreme Court, the more latitude the state courts have in reaching reasonable outcomes in case-by-case determinations." Cheney v. Washington, 614 F.3d 987, 995 (9th Cir. 2010) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). "In turn, the state courts' greater leeway in reasonably applying a general rule translates to a narrower range of decisions that are objectively unreasonable under AEDPA." Cheney, 614 F.3d at 995. Accord Renico, 559 U.S. at 776 ("Because AEDPA authorizes federal courts to grant relief only when state courts act *unreasonably,* it follows that '[t]he more general the rule' at issue—and thus the greater the potential for reasoned disagreement among fair-minded judges—'the more leeway [state] courts have in reaching outcomes in case-by-case determinations.'" (quoting Yarborough, 541 U.S. at 664)).

Here, apart from S.M.'s testimony, the other evidence admitted at trial included S.M.'s CART interview in which she stated that Petitioner made her "suck on" his "pee pee" one time, tried to force her to do it "lots of times," and touched her "pee pee" over her clothes multiple times, telling her "[i]t feels good" but "to keep it secret," (2 CT 425–26, 430–31; 6 RT[13] 475–77); S.M.'s mother testimony about S.M.'s disclosures that Petitioner touched S.M. inappropriately, gesturing that Petitioner had rubbed her vagina, and that Petitioner "tried to make her do this," gesturing "[w]ith a hand in a circular motion moving back and forth towards the mouth," (6 RT 355–56); and one image of child pornography and eighty-one images of child exploitation and child erotica found on Petitioner's computer, (8 RT 794–95, 812–22). Additionally, the jury was specifically instructed on how to evaluate a child's testimony and explicitly told not to let bias or sympathy influence their decision. (2 CT 540, 521.) "[U]nder Supreme Court precedent, a jury is presumed to follow the trial court's instructions." Deck v. Jenkins, 814 F.3d 954, 979 (9th Cir. 2016) (citing Weeks v. Angelone, 528 U.S. 225, 234 (2000)). Petitioner presents no evidence suggesting that the jury departed from the trial court's instructions. In light of the other evidence admitted at trial and the trial court's instructions, and

---

[13] "RT" refers to the Reporter's Transcript on Appeal lodged by Respondent. (ECF No. 24.)

1  given that a "narrower range of decisions . . . are objectively unreasonable under AEDPA" due to

2  the general standard governing mistrials, the state court was not objectively unreasonable in

3  denying the fair trial claim based on the trial court's failure to declare a mistrial after S.M.'s

4  emotional testimony in the courtroom.

5      Further, to the extent Petitioner asserts that S.M.'s emotional testimony in the courtroom

6  was so prejudicial as to violate due process, the Court finds Petitioner is not entitled to habeas

7  relief. "[T]he admission of evidence in state court is not subject to federal habeas review unless

8  the admission of the testimony was arbitrary or fundamentally unfair." Drayden v. White, 232

9  F.3d 704, 710 (9th Cir. 2000) (internal quotation marks omitted) (quoting Colley v. Sumner, 784

10 F.2d 984, 990 (9th Cir. 1986)). "Although the [Supreme] Court has been clear that a writ should

11 be issued when constitutional errors have rendered the trial fundamentally unfair, it has not yet

12 made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due

13 process violation sufficient to warrant issuance of the writ." Holley v. Yarborough, 568 F.3d

14 1091, 1101 (9th Cir. 2009) (internal citation omitted). Accord Walden v. Shinn, 990 F.3d 1183,

15 1204 (9th Cir. 2021). "Absent such 'clearly established Federal law,' we cannot conclude that

16 the state court's ruling was an 'unreasonable application.'" Holley, 568 F.3d at 1101 (quoting

17 Musladin, 549 U.S. at 77).[14]

18     "[T]he Constitution entitles a criminal defendant to a fair trial, not a perfect one,"

19 Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986), and Petitioner has not demonstrated that "no

20 'fairminded juris[t]' could have reached the same judgment as the state court," Shinn, 596 U.S.

21 at 378 (alteration in original) (quoting Harrington, 562 U.S. at 102). Accordingly, the Court finds

22 that the state court's rejection of the fair trial claim was not contrary to, or an unreasonable

23 application of, clearly established federal law, nor was it based on an unreasonable determination

24 of fact. The decision was not "so lacking in justification that there was an error well understood

25 and comprehended in existing law beyond any possibility for fairminded disagreement." Richter,

---

[14] Although circuit caselaw is not governing law under AEDPA, this Court must follow Ninth Circuit precedent that has determined what federal law is clearly established. Byrd v. Lewis, 566 F.3d 855, 860 n.5 (9th Cir. 2009). See Campbell v. Rice, 408 F.3d 1166, 1170 (9th Cir. 2005) (en banc) (Ninth Circuit "precedents may be pertinent to the extent that they illuminate the meaning and application of Supreme Court precedents.").

562 U.S. at 103. Therefore, Petitioner is not entitled to habeas relief on his second claim, and it should be denied.

## V.

### RECOMMENDATION & ORDER

Based on the foregoing, the Court HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED.

Further, the Court HEREBY ORDERS that Petitioner's request for oral argument (ECF No. 29) is DENIED.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within **FOURTEEN (14) days** after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned District Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **July 24, 2024**

UNITED STATES MAGISTRATE JUDGE